# APPENDIX 1

VanNess Feldman LLP

1191 Second Avenue
Suite 1800
Seattle, WA 98101
206-623-9372

**James P. Grifo, Counsel**
360-298-4782
jgrifo@vnf.com

SUBJECT TO EVIDENCE RULE 408
NOT ADMISSIBLE TO PROVE LIABILITY IN CIVIL PROCEEDINGS
OR TO PROVE GUILT IN CRIMINAL PROCEEDINGS

February 14, 2024

VIA EMAIL AND FIRST-CLASS MAIL

Neil Caulkins
Assistant Attorney General
Public Lands & Conservation Division
P.O. Box 40100
Olympia, WA 98504-0100
E: neil.caulkins@atg.wa.gov

Re: **Wade and Teresa King, dba King Ranch and Arena**
**Request for Meeting with Commissioner Franz**

Dear Mr. Caulkins,

We are writing on behalf of our clients Wade and Teresa King to respectfully request a meeting with Commissioner Franz. The Kings want to ensure that Commissioner Franz is personally aware of how the Department of Natural Resources (DNR) has treated them, and they hope a direct discussion with the Commissioner will help chart a path forward that will work for the Kings and DNR. They also believe this discussion will help create a workable framework for other eastern Washington ranchers who face evolving and often ambiguous regulatory requirements. Please share this letter with the Commissioner and DNR's General Counsel Daniel Teimouri and pass along our clients' request for a meeting.

The Kings have owned and operated a ranch in eastern Washington for decades, and, until recently, they have had a positive working relationship with DNR and its staff. Recently, however, DNR and the Department of Ecology (Ecology) concluded that certain areas the Kings have consistently and lawfully used for stock watering purposes should now be treated as untouchable "alkali wetlands." The agencies are alleging excavation activities in those areas that they say violated regulatory requirements and the Kings' grazing lease with DNR. As explained below, these allegations are based on a flawed process that reached mistaken conclusions.

We hope this letter will help the Commissioner understand why DNR and the Kings arrived at this impasse. After decades of cooperation, the Kings hope the Commissioner will view this outreach

as an opportunity to not only make this right, but to do so in a way that creates a win-win situation for eastern Washington ranchers, Ecology, and DNR, while also protecting the environment.

**Background on the King Ranch.**

The Kings own and operate the King Ranch in Grant and Douglas counties. The ranch includes approximately 22,000 acres of "deeded" fee simple property and approximately 17,000 acres of leased land, most of which is leased from DNR. The Commissioner might recall meeting the Kings at Senator Warnick's office in Moses Lake on October 12, 2017.

The Kings' fourth, fifth, and sixth generations carry on the family business of operating a cattle ranch in Coulee City, which their predecessors started nearly 70 years ago. The King family homesteaded in Eastern Washington in 1910, over 114 years ago. Wade and Teresa King personally operate the ranch, with help from one of their daughters and one employee.

The Kings have worked hard over the past 40 years to be good stewards of the land, and their relationship with DNR and its staff, including Brent Billingsley, Mark Bohnet, Rhetta Cypert, Katie Mink, Todd Welker, and numerous other personnel, has been positive in the past. The Kings have always conducted their agricultural operations consistent with standard industry practices designed to provide stock water and benefit wildlife in this arid part of the state.

Until 2021, the Kings had never had any problems with DNR, Ecology, or any other agency. But that year, DNR and Ecology suddenly announced that existing agricultural areas on the King Ranch, which have been used for stock watering for decades, are now "alkali wetlands" that can never be touched again. The agencies also claimed that the alleged excavation of dugout stock ponds for cattle and wildlife in these areas caused "pollution" that violated the Water Pollution Control Act (RCW chapter 90.48) and Ecology's Surface Water Standards (WAC 173-201A).

This dispute with DNR and Ecology involves a unique context and set of circumstances that key staff members at Ecology and DNR failed to consider. As a result, Ecology's and DNR's positions are based on a fundamental misunderstanding of the law and the facts. As further explained below:

- Ecology and DNR staff rushed to judgment, without considering the agricultural context, jumping to the conclusion that the areas in question are, in fact, regulated wetlands; that the alleged activity in question violated the Water Pollution Control Act and the Surface Water Standards; and that Ecology and DNR could never authorize any agricultural activities (even existing and ongoing activities) in areas that Ecology staff believe are "alkali wetlands."

- Ecology and DNR staff misinterpreted the Surface Water Standards as providing absolute protection to certain "beneficial uses" that Ecology staff members claim are being provided by the alleged "alkali wetlands," while ignoring and providing no protection or support for the only existing, designated, and beneficial use of the King Ranch that the legislature has specifically declared to be beneficial: ***stock watering***.

- Ecology and DNR staff misinterpreted the Kings' healthy suspicion of the motives of Ecology staff (which turned out to be correct) as a lack of "cooperation" and held that against them.

- Far from causing "pollution" or violating the Surface Water Standards, the alleged excavation activities provided a net benefit to the beneficial uses on the King Ranch by supporting stock watering; providing a variety of habitat types for different migratory and other birds; providing water and vegetation for other wildlife in an area where water is scarce; providing added water volume that has more capacity to trap pollutants; and providing wildfire resilience.

- Ecology and DNR staff failed to consider the unique nature of so-called "alkali wetlands," which are the among the driest types of land areas that Ecology sometimes claims are regulated wetlands, and are among the most difficult to identify.

**Ecology and DNR staff failed to consider the unique nature of so-called "alkali wetlands."**

The agencies' allegations of legal violations are based on Ecology's position that certain areas on the King Ranch that had been used for stock watering activities for decades—which no one ever called "wetlands"—can now be regulated as "alkali wetlands."

Ecology and DNR staff also claim that digging was done "without authorization." In the past, however, no advance authorization has ever been required by Ecology, DNR, or any other agency for any similar stock water activities on the King Ranch or, to our knowledge, on any other ranch or farm in Washington State. Moreover, the alleged excavation activities were consistent with industry standards for dugout stock ponds. In the past, the Kings have always taken care to ensure their agricultural operations align with industry practices for stock ponds and with the terms of their DNR leases.[1] Moreover, enforcement records in this matter and Ecology guidance documents make it clear that Ecology's position is that it *would not have authorized* the alleged activities, or any other activities, in these areas the agency considers to be "alkali wetlands."

We encourage the Commissioner to ask staff to explain the scientific and regulatory differences between traditional wetlands and "alkali wetlands," which are not defined or even mentioned in the Water Pollution Control Act or the Surface Water Standards. They appear only in Ecology's guidance documents.

These alleged "alkali wetlands" don't look anything like traditional, western Washington-style wetlands with cattails or bulrush and standing water, or some other obvious visual signs of wetness. In contrast to western Washington-style wetlands, "alkali wetlands" are often very dry, sometimes for years at a time. According to Ecology guidance, a typical "alkali wetland" may be wet for less than two months in a typical year; and that during the other ten months of the year, when these areas are dry, they become dominated by *upland* plants and wildlife. Aerial photos confirm that these areas were all dry at the time of the alleged excavation activities, which is consistent with

[1] To be clear, the Kings categorically deny all allegations regarding unauthorized excavations.

industry practices for excavating dugout stock ponds. The U.S. Department of Agriculture (USDA) Farm Maps and Natural Resources Conservation Service (NRCS) soil maps show that these areas do not have any wetlands, ponding or saturation, or saturated soils. Ecology water quality guidance for agriculture recommends NRCS soil maps and the USDA as key sources of information regarding whether wetlands exist on agricultural lands, but Ecology staff proceeded with aggressive enforcement even after reviewing NRCS soil maps showing no saturated soils or other indicators of saturation in these areas.

As Ecology's guidance documents recognize, these alleged "alkali wetlands" do not look like traditional wetlands, and they are extremely difficult to identify. In fact, the Kings' qualified consultants are telling us that these areas are *not* regulated "wetlands"—because they do not meet the scientific criteria and regulatory definition for wetlands, which requires evidence of saturation, saturated ("hydric") soils, and dominance by water-loving ("hydrophytic") plants that thrive in these wet conditions. In particular, one of our clients' experts is a preeminent soil scientist who has now confirmed, with a high degree of confidence, that no hydric soils were found anywhere in the vicinity of the alleged excavation activities.

But Ecology's criteria for evaluating "alkali wetlands" focus on indicators of *alkalinity* (such as whether the pH of the soils is *alkaline*, and whether the area is dominated by *alkali*-loving plants) not indicators of wetness (such as whether the soils are saturated, and whether the area is dominated by water-loving plants). And the values Ecology seeks to protect in "alkali wetlands" also focus on alkalinity rather than wetness. As explained below, Ecology is not seeking to protect the same values that are protected by traditional "cattail" wetlands, such as flood prevention and water quality protection. Instead, Ecology is using the "alkali" concept to elevate the protection of certain alkali-loving plants and invertebrates over all other considerations, including other existing, designated, and beneficial uses of these same alleged "alkali wetland" areas, such as stock watering.

**Ecology and DNR staff rushed to judgment and gave the Director and the Commissioner bad information.**

Ecology rushed to judgment on "alkali wetlands" issues, without following its own regulations and guidance, and without collecting any site-specific data. That flawed process caused Ecology staff to give Ecology's Director bad information, and that bad information was passed along to the Commissioner.

One day after Ecology first learned about the alleged activities, Ecology's lead investigator Jeremy Sikes was already talking about a criminal investigation. And within a week, Mr. Sikes had successfully pressured DNR to join Ecology in rushing to judgment.

Mark Bohnet, DNR's Northeast Columbia Basin Unit Manager, had initially told Mr. Sikes that he "could understand the reasoning for the excavation work" because "water availability was a limiting factor in that area" for a "cattle operation." He said there were "no specific conditions in the lease regarding this type of work." Instead of pursuing enforcement, Mr. Bohnet was inclined

"to leave the wetlands alone to self-restore" and said DNR "may change lease terms upon renewal."

But in that same discussion, Mr. Sikes rebuffed Mr. Bohnet's reasonable instincts to seek cooperation and insisted on aggressive enforcement. Mr. Sikes emphasized to DNR staff what he said was "the relative value and sensitivity of these alkali wetlands" and "the degree of concern Ecology had," and said Ecology "would very likely pursue enforcement much more directly." Mr. Sikes told Mr. Bohnet that these areas were "very likely alkali wetlands, which are not replaceable." Because of Ecology's belief that they are irreplaceable, he claimed they are "*automatically characterized* as Category 1 wetland afforded the highest level of protection under state water quality law" (emphasis added). Mr. Sikes "also informed him that under 90.48, *DNR would actually be the responsible party*, at which point we both decided a management-level conversation would be best" (emphasis added).

Mr. Sikes' threats of potential enforcement against DNR, based on an "automatic" wetland characterization at the "highest" level, appear to have had the intended effect. Less than two weeks later, DNR sent its first notice to the Kings alleging a lease violation based on Ecology's position that "alkali wetlands" had been damaged. In the notice, DNR's Southeast Regional Manager, Todd Welker, claimed that the lease required "[p]rior written authorization" for any ground disturbing work, but DNR had never interpreted the Kings' lease that way in the past. DNR's notice ordered the Kings to sign an open-ended statement, with unknown requirements and unknown costs, admitting to Ecology's false allegations that "14 Alkali ponds" were damaged by "ground disturbing work on this lease." The statement included a blank-check commitment to "cooperate fully to restore all 14 Alkali ponds once DOE has determined a restoration plan." Since that time, we have learned that Ecology's own guidance documents (including the same guidance Ecology ordered the Kings to follow when restoring the alleged "alkali wetlands") state that the agency believes it is not even possible to restore "alkali wetlands." We hope you can understand why, in light of the history and context provided in this letter, the Kings would refuse to sign such a statement.

By January 25, 2022, less than two months after Mr. Sikes received the initial email from WDFW, Director Watson was already sharing with Commissioner Franz incorrect reports from Ecology staff of "serious, unpermitted damage" to 17 "rare, alkali wetlands." That unreliable information misled Director Watson and Commissioner Franz into mistakenly believing that the regulated status of these areas, and the allegedly harmful nature of the alleged activities, had already been definitively established by credible data. In reality, Ecology's position at that time was based solely on "data provided by the reporting party, [Washington Department of Fish and Wildlife (WDFW)], and a review of July 2021 aerial imagery," but no site-specific data.

Additional detail on the procedural and substantive flaws in the investigation by Ecology staff is included in the Kings' letter to Ecology's Director Laura Watson, a copy of which is enclosed with this letter.

**The alleged excavation activities did not cause any "pollution" or violate any Surface Water Standards.**

Ecology's press release accused the Kings of causing "pollution" and violating the Surface Water Standards through the alleged activities, but this is not a case of industry dumping chemicals into a river, or where a developer has drained, filled, converted, and paved a western Washington wetland for a development project that will cause pollution downstream. On the contrary, some of the scientific literature discusses potential water quality benefits from the kinds of dugout stock ponds used in the ranching industry.

The alleged "pollution" here is simply the same on-site soils that Ecology says were disturbed by the alleged activities. Excavation in western Washington-style wetlands can sometimes cause harmful downstream sedimentation, but Ecology had admitted that these alleged "alkali wetlands" "are isolated from other surface waters of the state," so there can be no downstream pollution from the alleged excavation activities. Ecology's guidance documents recognize that "alkali wetlands" do not perform important water quality functions. The agency's guidance also indicates that any pollutant trapping function performed by "alkali wetlands" is mostly a function of the volume of water stored in each "alkali wetland," which was *increased* by the alleged activities.

And as explained below, when the unique nature of the King Ranch is properly understood, and when the site-specific beneficial uses of these sites are correctly analyzed in the context of the overall needs of this landscape, it becomes clear that *Ecology staff had it exactly backwards*: far from impairing beneficial uses, these alleged excavation activities actually provided a net benefit to the beneficial uses that actually exist on the ground—not only by supporting stock watering, but also by providing water and habitat for birds and other animals and plants, providing more water that can trap more pollutants, and preventing the eventual disappearance of *any* wet areas on the King Ranch, which scientific literature confirms is inevitable with sedimentation over time.

**Ecology staff misinterpreted the Surface Water Standards as prohibiting any activities in areas it considers "alkali wetlands," regardless of the actual beneficial uses of a site.**

Ecology staff's analysis of the Surface Water Standards (WAC 173-201A) was built around staff's rushed decision that these areas meet the regulatory definition for "wetlands" and the criteria in Ecology guidance for "alkali wetlands." The analysis was also based on staff's rushed decision that *the only possible beneficial uses* of these areas are the values the agency claims are associated with alkali wetlands, even though staff knew these areas were historically used for stock watering.

Ecology staff reasoned that, because they believed these areas to be "alkali wetlands" (which staff said were part of ecological systems listed in the Washington Natural Heritage Program as "Imperiled" and "Critically Imperiled"), *all agricultural and other activities in or around these areas are automatically and absolutely prohibited*. This approach wrongly treats DNR's non-regulatory Natural Heritage Program as dictating a "no touch" approach to "alkali wetlands" under the Water Pollution Control Act, and it wrongly elevates Ecology staff's desire to protect what it sees as the "beneficial uses" of "alkali wetlands" over all other existing, designated, and beneficial uses.

*Ecology failed to follow its own water quality regulations and guidance.*

Ecology staff failed to follow the "Procedures for applying water quality criteria" in WAC 173-201A-260(3), which requires Ecology to evaluate water quality in wetlands by applying specific criteria. The water quality criteria for wetlands state that "[w]ater quality in wetlands is maintained and protected by maintaining the hydrologic conditions, hydrophytic vegetation, and substrate characteristics necessary to support existing and designated uses." On the King Ranch, *stock watering* is the only existing and designated use of waters, and it is the only use the state legislature has declared to be legally "beneficial." Again, our consultants' opinion is that these "alkali" areas are not regulated wetlands; but even if that were not the case, Ecology's own standards say water quality in these alleged wetlands was protected by maintaining the hydrologic conditions, hydrophytic vegetation, and substrate characteristics necessary to support *stock watering*.

Ecology's own wetland guidance recognizes that "Wetlands are often located in the transition zone from deep water habitat (e.g., river, stream or lake) to upland, where the deep waterbody is actually being used for stock watering." The guidance is not specific to dugout stock ponds, but it recognizes "considerable debate concerning the use of wetlands for stock watering" and states that stock watering "must" be "protected." The guidance recommends that Ecology find a balance between protecting stock watering and preventing the activity from "significantly degrad[ing] a waterbody's ability to perform other beneficial uses (e.g., fish and wildlife habitat)," and that Ecology do so "through BMPs and other regulatory and nonregulatory efforts is essential to ensuring wetlands and other waterbodies can support all legitimate beneficial uses possible."

Ignoring the status of stock watering as a beneficial use, Ecology's enforcement order says the alleged excavation activities impaired "the beneficial uses that these wetlands provide to *wildlife and other aquatic life*." But as explained below, the opposite is true: dugout stock ponds create and enhance habitat for birds and other wildlife, for the simple reason that they provide life-sustaining water in this arid region, where there are no streams or creeks and few seeps to drink from. As for "aquatic life," that is Ecology's reference to certain unspecified "nonfish" aquatic species that Ecology suggests may be present in the alleged "alkali wetland" areas. Ecology has not told us which "nonfish" aquatic species it believes were impacted by the alleged activities, but Ecology guidance suggests any life in these areas would have been limited to aquatic invertebrates (water bugs). In any case, because these areas were dry at the time of the alleged activities, there is no possibility of any impact to any water bugs or any other aquatic species.

In short, there was no "pollution," and this is not about water quality or flow control. Ecology's guidance documents show that the agency values "alkali wetlands" not because they provide important water quality or flow control functions, but because Ecology prefers certain "alkali"-loving plants and invertebrate species over other species, and over other beneficial uses like stock watering.

Ecology's enforcement against the King Ranch turns the state's beneficial use framework on its head, by elevating water bugs over benefits to other species, and over legislatively-declared beneficial uses like stock watering. Ecology's surface water standards require Ecology to first

"protect" existing and beneficial uses, such as stock watering; and then, when there are multiple designated uses, to *balance* the uses rather than picking one designated or beneficial use over the other. After giving appropriate weight to the stock watering benefits, habitat benefits, and other potential benefits of dugout stock ponds, it would be unreasonable for Ecology to pick the alleged benefits of "nonfish aquatic species," or particular plant species, over stock watering, bird habitat, and other benefits resulting from the alleged activities.

**Benefits from dugout stock ponds to wildlife habitat and wildfire resilience.**

Ecology's press release also suggests that the alleged activities damaged habitat for migratory birds, but the opposite is true. There is broad consensus across the scientific community, and among bird advocacy nonprofits like Ducks Unlimited, that these kinds of dugout stock ponds provide significant benefits to migratory and other birds. Ecology's own guidance documents discuss the benefits that can result "when shallow ephemeral ponds are dredged to make areas with longer periods of standing water (such as stock ponds)," thereby "[i]ncreasing the duration of saturation or inundation [which] can change the use of wetlands by a variety of birds," including increased short-term use of unvegetated spoils of newly excavated basins by shorebirds, and increased long-term use by several species of diving and dabbling ducks, coots, and terns after revegetation.

Another benefit of dugout stock ponds is the preservation of wet areas on the arid Columbia Basin that would otherwise naturally disappear over time. Ecology's own guidance recognizes that, over the decades and centuries, any wet areas on the King Ranch will inevitably fill in with sediment. This is one reason why agencies like Ecology and DNR have embraced the benefits of wetland excavation in certain contexts: it removes built-up sediment, restoring the wetland hydrology that would not be present without excavation.

If Ecology were successful in stopping ranchers from digging historically exempt stock ponds on the Columbia Plateau, many of the areas Ecology considers to be "alkali wetlands" would fill in and dry up. That would eliminate important habitat for migratory birds and other species, in addition to shutting down ranching businesses and likely causing the conversion of agricultural land. It would also increase wildfire risk on grazing lands and abutting lands and hazards to ranchers, and their cattle and wildlife. Thus, a final benefit of the alleged activities is preventing the inevitable disappearance of all wet areas from the King Ranch.

*The State has engaged in the same type of excavation that is alleged to be illegal.*

WDFW has also embraced beneficial wetland excavation practices. For example, WDFW has engaged in beneficial excavation of "wetland cells" on state-owned land near the King Ranch, such as Desert Lake Ponds. According to WDFW, "[e]nhanced wetlands within the project waters will provide nesting and feeding habitat for a multitude of species," including ducks that provide waterfowl hunting opportunities at Desert Lakes and "other species that require early succession vegetation." Over the years, the Kings have seen a wide variety of birds and other wildlife come to drink water and live near dugout stock ponds on the ranch.

*Wildfire resilience.*

The Kings have also seen their stock ponds help to control and build resilience to wildfires on DNR grazing lands. One example was during the 2018 Grass Valley Fire, which caused a collective loss of $20–30 million according to the Foster Creek Conservation District. Twenty-four cattle died in the fire. Many structures and more than 75,000 acres of rangeland were burned. The Kings were the hardest hit, with nearly 18,550 acres of leased and fee-owned land burned. During that fire, the Kings took photos showing how the areas around their stock ponds were green and wet, while the surrounding areas were parched and on fire. When ranchers in the Upper Plateau of the Columbia Basin are hit with a massive wildfire like that one, which burned 10,000 acres per hour, with 60-foot-high flames, the dugouts provided safe haven for humans, cattle, and wildlife. During that fire, the Kings' family members were stuck in a situation where they knew they could not' outrun the fire, and they were forced to move their herd, one hundred mother cows with calves, to shelter in a semi-dried stock pond. They held the cattle there as flames burned around them. The Kings say they do not' know what would have happened if that stock pond had not been there. We know Commissioner Franz cares deeply about fire prevention, and we hope she will see how dugout stock ponds and other standard ranching practices can be part of DNR's efforts to mitigate risk and reduce fire damage. We would welcome the opportunity to discuss these issues with Commissioner Franz.

*DNR's change of position surprised the Kings and Eastern Washington ranchers.*

DNR staff have always been fully aware that ranchers and agricultural producers follow the industry and regional practice of digging stock ponds on DNR lease lands. Rather than treating dugout excavation of dugout stock ponds as a separate water "development" activity like digging a well or installing a pipeline, which might require some kind of advance authorization from DNR, DNR staff have historically treated the practice as a necessary part of the grazing use itself that did not require advance authorization. Over the decades, DNR's lease terms have reflected this interpretation by DNR staff.

Despite the long and productive relationship between DNR and the Kings, current DNR staff gave no consideration to past practices or interpretations before deciding to assert that the Kings were in breach of their lease because of allegedly digging in certain areas. Instead, DNR staff assumed Ecology's position was correct and unilaterally re-interpreted the lease in an effort to match the agencies' newly adopted position.

*DNR's Memorandum of Agreement with Ecology harms ranchers and compromises DNR's management authority.*

More recently, DNR staff entered into a 2023 Memorandum of Agreement (MOA) with Ecology that gives Ecology direct control over the terms of all future DNR grazing leases and other upland leases, again to the detriment of tenant ranchers like the Kings. Ecology's MOA requires DNR to incorporate maps into DNR leases in a way that could theoretically provide fair notice to ranchers or other lessees, which would be a welcome change from Ecology's current approach. However, Ecology's MOA states that DNR and lessees cannot' actually rely on the maps. And even if the

maps were legally reliable, they are not factually defendable. As Ecology has recognized elsewhere, the maps Ecology is requiring DNR to use are based on such flawed data that they will mostly provide false positives and false negatives, flagging many non-wetland areas as regulated, and missing many areas that actually are regulated wetlands.

The MOA also compromises DNR's authority to manage state-owned grazing lands, and it surrenders DNR's authority and obligation to manage grazing lands consistent with a specific set of ecosystem standards the legislature required state agencies to develop in the late 1990s. RCW 79.13.610 requires DNR to implement practices necessary to meet those ecosystem standards developed by incorporating them into grazing leases issued after December 31, 1994. RCW 79.13.620(2) explains that the standards "are not intended to prescribe practices" but instead "are defined as desired ecological conditions," and that "[f]or this reason, land managers are encouraged to use an adaptive management approach in selecting and implementing practices that work towards meeting the standards based on the best available science and evaluation tools." RCW 79.13.620(3) requires DNR to apply the standards "through a collaborative process that incorporates the following principles:"

> (a) The *land manager and lessee or permittee shall look at the land together and make every effort to reach agreement* on management and resource objectives for the land under consideration;
>
> (b) They will then *discuss management options and make every effort to reach agreement* on which of the available options will be used to achieve the agreed-upon objectives;
>
> (c) *No land manager or owner ever gives up* his or her management prerogative;
>
> (d) Efforts will be made to make land management plans *economically feasible* for landowners, managers, and lessees and to make the land management plan *compatible with the lessee's entire operation*;
>
> (e) *Coordinated resource management* planning is encouraged where either *multiple ownerships*, or *management practices*, or *both*, are involved;
>
> […]
>
> (g) The department shall allow multiple use on lands owned or managed by the department where multiple use can be demonstrated to be compatible with RCW 79.10.100, 79.10.110, and 79.10.120.
>
> (4) The ecosystem standards are to be achieved *by applying appropriate land management practices* on riparian lands and on the uplands in order to reach the desired ecological conditions.
>
> (5) The legislature urges that state agencies that manage grazing lands *make planning and implementation of chapter 163, Laws of 1996, using the coordinated resource*

> *management and planning process, a high priority*, especially where either *multiple ownerships*, or *multiple use resources objectives*, or *both*, are involved . . .

To date, DNR has not followed this process with the Kings, but we hope the Commissioner can help get DNR back on track.

**Why the Kings went silent.**

We believe one reason DNR and Ecology staff jumped to conclusions about what they were seeing on the King Ranch in aerial photos and other images was the Kings' reaction to the cloud of jeopardy created by the Environmental Protection Division's criminal investigation. That investigation forced the Kings to withdraw from direct communication for several months while they obtained the advice of counsel.

Initially, the Kings tried to communicate with Ecology and DNR about these issues, but by March of 2022, they had grown concerned that Ecology staff members were not acting in a reasonable, good-faith basis to resolve this matter, and instead were scheming to gather evidence that could be misused against the Kings. And indeed, as noted above, Ecology staff members were in fact pursuing a criminal investigation from the very beginning, at the same time they were claiming to offer "technical assistance" to the Kings. Because of the threat of criminal prosecution, the Kings were forced to stop communicating openly with Ecology and DNR. Unfortunately, both agencies' staff misinterpreted the Kings' healthy suspicion (which turned out to be correct) as a lack of "cooperation," and then held that against them.

After careful consideration, as part of their right to petition elected government officials, and to reach out to DNR as their long-term landlord, the Kings have decided to have their counsel share the information in this letter, which focuses on the issues we believe DNR cares about most. We hope you will agree that DNR should not punish lessees and citizens for being cautious and protective of their constitutional rights when two powerful government agencies and the Attorney General's Office suddenly accuse them of damaging the environment and committing crimes.

**Compliance with DNR directives and respect for cultural resources.**

It is important for the Commissioner to know that the Kings have complied with all DNR directives. Despite what you and Commissioner Franz have almost certainly heard about the site Ecology refers to as "DNR 20," aerial photos clearly prove that *there were no excavation activities on DNR 20 or any other DNR land after DNR notified the Kings about the alleged activities*. We will be sharing these aerial photos with DNR soon, but we wanted to be clear about this issue up front because we know misconceptions about the timing of the alleged activities is a key issue in this dispute.

These unfortunate misconceptions about timing have led to further misconceptions about cultural resources. We want the Commissioner to know that the Kings have great respect for cultural resources and would never do anything to intentionally or knowingly harm them. As noted above, contrary to DNR staff's statements, aerial photos prove that *no excavation activities occurred on DNR land after notice to the Kings.* DNR staff also misinterpret the Kings' lease and the law as

requiring advance notice to DNR before any ground disturbing activity occurs on a grazing lease, but DNR has never interpreted the lease that way in the past. Instead, DNR considered ground disturbing activities for the purpose of maintaining adequate dugout stock ponds over time across the ranch to be an essential part of the grazing use. In short, DNR staff's allegations of knowing damage to cultural resources are absolutely unfounded.

**Request for meeting.**

The Kings are not litigious people. They would very much prefer to focus their time and efforts on their family, raising the highest quality cattle they can, feeding people, and stewarding the land they have loved and managed for decades. Unfortunately, with the entire State of Washington now coming after them, the Kings have been villainized, defamed, and forced to defend themselves. We do not know everything the Commissioner has heard about the Kings, but we are concerned that much of it is based on misinformation and unsupported assumptions. As a result of the many flaws in the State's process, the State's actions now threaten to destroy the Kings, their family business, and their industry. We understand that Commissioner Franz's grandfather was a rancher in Pierce County, and we hope that the Commissioner might be able to imagine how shocked the Kings were (and continue to be) as all of this has unfolded.

We would also like the Commissioner to understand that a few weeks ago, we reached out to you to see if we could pause the litigation with DNR and meet to discuss the issues in hopes of finding a mutually agreeable resolution. As you know, DNR flatly rejected our invitation. As DNR's attorney, you indicated that DNR had decided it wanted instead to proceed with litigation. That decision forced us to proceed with a hearing on DNR's motion to bifurcate, which was denied, and our motion to stay, which was granted. We do not understand why DNR would outright refuse to meet with us, or why DNR would prefer to spend time, energy, and taxpayers' money on litigation when the Kings have not even had a chance to meet with DNR to try and work this out and discuss the issues.

As you know, on September 21, 2023, we also sent a letter asking DNR to withhold judgment on "wetlands" issues within the jurisdiction of the Pollution Control Hearings Board (PCHB) until the appeal process is concluded, and asking DNR for a separate discussion about any other issues besides wetlands. We went out of our way to extend an olive branch from the Kings and asked for a discussion about how we might be able to work together "to find a means of resolution that will not require protracted legal proceedings, foment distrust, or undermine and jeopardize what by all accounts has been a positive relationship between our clients and DNR for decades." We wish DNR had responded to that request last year, but we were happy to hear in your recent email that DNR might now be amenable to some kind of arrangement involving a pause during the PCHB proceedings.

We are sending this letter now because there may be a final, yet small, window of opportunity for us to work together to clarify any misunderstandings and resolve these issues through discussions instead of court filings. We genuinely believe the Commissioner cares about DNR, the environment, the agricultural industry, the local economy, all the hardworking farmers and ranchers to whom DNR leases land, and their families and communities. The issues in the Kings'

case are not unique to them, and we think the Commissioner will agree that DNR needs to find a way to collaborate with its tenant ranchers on these issues—now and in the future. We hope the Commissioner will take this opportunity to meet with us to see whether there might be a way for the Kings to mend fences with DNR and chart a path forward that will benefit everyone: DNR, the Kings, all other tenant ranchers in the state of Washington, taxpayers, the general public, and the environment.

We appreciate Commissioner Franz's time and consideration of this request. We look forward to receiving written confirmation from you, *within ten days from the date of this letter*, that Commissioner Franz would like to schedule a meeting to discuss these issues, and the King Ranch matter, in the immediate future. If we do not hear from you within ten days from the date of this letter, then our clients will interpret that lack of response to mean DNR has no interest in trying to find a way to work together to informally resolve these issues, and they will proceed accordingly. We look forward to hearing from you soon.

Kind regards,

VAN NESS FELDMAN LLP

James P. Grifo
Counsel

Duncan M. Greene
Partner

Enclosure
cc: Sonia Wolfman, AAG, via email (w/encl.)

# APPENDIX 2

VanNess Feldman LLP

1191 Second Avenue
Suite 1800
Seattle, WA 98101
206-623-9372

**Duncan Greene, Partner**
206-829-1818
dmg@vnf.com

SUBJECT TO EVIDENCE RULE 408
NOT ADMISSIBLE TO PROVE LIABILITY IN CIVIL PROCEEDINGS
OR TO PROVE GUILT IN CRIMINAL PROCEEDINGS

February 14, 2024

VIA EMAIL AND FIRST-CLASS MAIL

Sonia Wolfman
Assistant Attorney General
Ecology Division
Public Lands & Conservation Division
P.O. Box 40117
Olympia, WA 98504- 0117
E: sonia.wolfman@atg.wa.gov

Re: **Wade and Teresa King, dba King Ranch and Arena**
**Request for Meeting with Director Watson**

Dear Ms. Wolfman,

We are writing on behalf of our clients, Wade and Teresa King, to respectfully request a meeting with Director Watson. The Kings want to ensure that Director Watson is personally aware of how the Department of Ecology (Ecology) has treated them, and they hope a direct discussion with the Director will help chart a path forward that will work for everyone. They also believe this discussion will help create a workable framework for other eastern Washington ranchers who face evolving and often ambiguous regulatory requirements. Please share this letter with the Director and pass along our clients' request for a meeting.

The Kings have owned and operated a ranch in eastern Washington for decades, and until recently, they have never had any problems with Ecology, the Department of Natural Resources (DNR), or any other agency. Recently, however, Ecology and DNR concluded that certain areas the Kings have consistently and lawfully used for stock watering purposes should now be treated as untouchable "alkali wetlands." The agencies are alleging excavation activities in those areas that they say violated regulatory requirements and the Kings' grazing lease with DNR. As explained below, these allegations are based on a flawed process that reached mistaken conclusions.

We hope this letter will help the Director understand why Ecology and the Kings arrived at this impasse, and how the Director now has an opportunity to make this right and to create a win-win

situation for eastern Washington ranchers, Ecology, and DNR, while also protecting the environment.

**Background on the King Ranch.**

The Kings own and operate the King Ranch in Grant and Douglas counties. The ranch includes approximately 22,000 acres of "deeded" fee simple property and approximately 17,000 acres of leased land, most of which is leased from DNR.

The Kings' fourth, fifth, and sixth generations carry on the family business of operating a cattle ranch in Coulee City, which their predecessors started nearly 70 years ago. The King family homesteaded in Eastern Washington in 1910, over 114 years ago. Wade and Teresa King personally operate the ranch, with help from one of their daughters and one employee.

The Kings have worked hard over the past 40 years to be good stewards of the land. The Kings have always conducted their agricultural operations consistent with standard industry practices designed to provide stock water and benefit wildlife in this arid part of the state.

For decades, the Kings had never had any problems with Ecology, DNR, or any other agency. But in 2021, Ecology and DNR suddenly announced that existing agricultural areas on the King Ranch, which had been used for stock watering for decades, are now "alkali wetlands" that can never be touched again. The agencies also claimed that the alleged excavation of dugout stock ponds for cattle and wildlife in these areas caused "pollution" that violated the Water Pollution Control Act (RCW chapter 90.48) and Ecology's Surface Water Standards (WAC 173-201A).

This dispute with DNR and Ecology involves a unique context and set of circumstances that key staff members at Ecology failed to consider. As a result, Ecology's and DNR's positions are based on a fundamental misunderstanding of the law and the facts. As explained below:

- Ecology and DNR staff rushed to judgment, without considering the agricultural context, jumping to the conclusion that the areas in question are, in fact, regulated wetlands; that the alleged activity in question violated the Water Pollution Control Act and the Surface Water Standards; and that Ecology and DNR could never authorize any agricultural activities (even existing and ongoing activities) in areas that Ecology staff believe are "alkali wetlands."

- Ecology and DNR staff misinterpreted the Kings' healthy suspicion of the motives of Ecology staff (which turned out to be correct) as a lack of "cooperation" and held that against them.

- Ecology staff made fundamental errors in process and substance in their investigation, including failing to comply with RCW 90.48.450, which requires Ecology's enforcement actions to consider and minimize the possibility of conversion of agricultural land; failing to consider RCW 90.48.422, which prohibits Ecology's enforcement actions from impairing stock water rights and issuing enforcement orders; and misinterpreting the Surface Water Standards as providing absolute protection to certain "beneficial uses" that

Ecology staff members claim are being provided by the alleged "alkali wetlands," while ignoring and providing no protection or support for the only existing, designated, and beneficial use of the King Ranch that the legislature has specifically declared to be beneficial: ***stock watering***.

- Far from causing "pollution" or violating the Surface Water Standards, the alleged excavation activities provided a net benefit to the beneficial uses on the King Ranch by supporting stock watering; providing a variety of habitat types for different migratory and other birds; providing water and vegetation for other wildlife in an area where water is scarce; and providing added water volume that has more capacity to trap pollutants.

- Ecology and DNR staff failed to give adequate consideration to the unique nature of so-called "alkali wetlands," which are the among the driest types of land areas that Ecology sometimes claims are regulated wetlands, and are among the most difficult to identify. Staff also failed to give any consideration to how the functions and values of the alleged "alkali wetlands" in this dispute might actually interact with this vast, arid, agricultural landscape.

**Ecology and DNR staff failed to consider the unique nature of so-called "alkali wetlands."**

The agencies' allegations of legal violations are based on Ecology's position that certain areas on the King Ranch that had been used for stock watering activities for decades—which no one ever called "wetlands"—can now be regulated as "alkali wetlands."

Ecology and DNR staff also claim that digging was done "without authorization." In the past, however, no advance authorization has ever been required by Ecology, DNR, or any other agency for any similar stock water activities on the King Ranch or, to our knowledge, on any other ranch or farm in Washington State. Moreover, the alleged excavation activities were consistent with industry standards for dugout stock ponds. In the past, the Kings have always taken care to ensure their agricultural operations align with industry practices for stock ponds and with the terms of their DNR leases.[1] Moreover, enforcement records in this matter and Ecology guidance documents make it clear that Ecology's position is that it *would not have authorized* the alleged activities, or any other activities, in these areas the agency considers to be "alkali wetlands."

We encourage the Director to ask staff to explain the scientific and regulatory differences between traditional wetlands and "alkali wetlands," which are not defined or even mentioned in the Water Pollution Control Act or the Surface Water Standards. They appear only in Ecology's guidance documents.

These alleged "alkali wetlands" don't look anything like traditional, western Washington-style wetlands with cattails or bulrush and standing water, or some other obvious visual signs of wetness. In contrast to western Washington-style wetlands, "alkali wetlands" are often very dry, sometimes for years at a time. According to Ecology guidance, a typical "alkali wetland" may be wet for less

[1] To be clear, the Kings categorically deny all allegations regarding unauthorized excavations.

than two months in a typical year; and that during the other ten months of the year, when these areas are dry, they become dominated by *upland* plants and wildlife. Aerial photos confirm that these areas were all dry at the time of the alleged excavation activities, which is consistent with industry practices for excavating dugout stock ponds. The U.S. Department of Agriculture (USDA) Farm Maps and Natural Resources Conservation Service (NRCS) soil maps show that these areas do not have any wetlands, ponding or saturation, or saturated soils. Ecology water quality guidance for agriculture recommends NRCS soil maps and the USDA as key sources of information regarding whether wetlands exist on agricultural lands, but Ecology staff proceeded with aggressive enforcement even after reviewing NRCS soil maps showing no saturated soils or other indicators of saturation in these areas.

As Ecology's guidance documents recognize, these alleged "alkali wetlands" do not look like traditional wetlands, and they are extremely difficult to identify. In fact, the Kings' qualified consultants are telling us that these areas are *not* regulated "wetlands"—because they do not meet the scientific criteria and regulatory definition for wetlands, which requires evidence of saturation, saturated ("hydric") soils, and dominance by water-loving ("hydrophytic") plants that thrive in these wet conditions. In particular, one of our clients' experts is a preeminent soil scientist who has now confirmed, with a high degree of confidence, that no hydric soils were found anywhere in the vicinity of the alleged excavation activities.

But Ecology's criteria for evaluating "alkali wetlands" focus on indicators of *alkalinity* (such as whether the pH of the soils is *alkaline*, and whether the area is dominated by *alkali*-loving plants) not indicators of wetness (such as whether the soils are saturated, and whether the area is dominated by water-loving plants). And the values Ecology seeks to protect in "alkali wetlands" also focus on alkalinity rather than wetness. As explained below, Ecology is not seeking to protect the same values that are protected by traditional "cattail" wetlands, such as flood prevention and water quality protection. Instead, Ecology is using the "alkali" concept to elevate the protection of certain alkali-loving plants and invertebrates over all other considerations, including other existing, designated, and beneficial uses of these same alleged "alkali wetland" areas, such as stock watering.

**Ecology and DNR staff rushed to judgment and gave the Director and the Commissioner bad information.**

Ecology rushed to judgment on "alkali wetlands" issues, without following its own regulations and guidance, and without collecting any site-specific data. That flawed process caused Ecology staff to give the Director bad information, and that bad information was passed along to the Commissioner.

As detailed below, the public record shows that Ecology's review of this matter started from the conclusion that these areas *must* be "alkali wetlands," and that these kinds of activities *could obviously never be allowed*, and then worked backwards from there, piecing together cherry-picked bits of data and guidance, which Ecology staff hoped would be enough to fill the obvious holes in their case. Ecology alleged violations at 18 different sites, but Ecology staff visited and gathered field data from only a few sites. That data did not meet Ecology's data credibility

requirements. And as explained below, the data was not adequate to make a wetland determination even as to those sites, much less the remaining sites.

But Ecology staff was undeterred. For most of these alleged "alkali wetlands," Ecology staff based their conclusions solely on a limited number of hand-picked aerial photos, which staff believed showed a "bright white signature at most of the sites." Despite their apparent lack of expertise or training in analysis of aerial photos, staff used aerial photos to "infer," to "deduce," and ultimately to "assume" that all of the sites meet the regulatory definition for "wetlands" and Ecology's purported criteria for "alkali wetlands."

In short, staff jumped to the conclusion that all of these areas are "alkali wetlands"; and then jumped to the conclusion that any activities in such alleged wetlands will necessarily cause "pollution" and will always violate water quality standards, regardless of what beneficial uses actually exist at the particular site, and regardless of any other context. Based on these false premises, staff concluded that activities in these kinds of areas *can never be authorized*, regardless of the circumstances—even when that means impairing or terminating other existing, beneficial, and designated uses like stock watering, and even when that means impairing or abrogating water rights and even when that means the risk of converting DNR grazing lands to nonagricultural use.

*Ecology staff insisted on aggressive enforcement while recognizing a lack of wetlands expertise.*

This extreme approach was driven by a small group of Ecology staff, some of whom are "backfilling" for other staff and appear to lack adequate experience with wetlands regulations. For example, Jeremy Sikes, the most active member of the group, told other Ecology staff, "I am not really in the wetlands arena anymore, but I am backfilling for Jacob McCann"; and that, "When it comes to the nitty gritty of wetland delineation, I am not just rusty, I am solid rust." But on December 6, 2021, when Mr. Sikes first learned about the alleged excavation activities, he did not express any such modesty about his lack of wetlands expertise. Earlier that day, Mr. Sikes had read an email from a staff member at the Washington Department of Fish and Wildlife (WDFW), who attached one photograph claiming to depict one of the alleged sites, opined that the photo depicted one of several sites that were "alkali wetlands," and said, "I doubt restoration is possible." In response, Mr. Sikes said he was "sad to see this kind of damage" and that, "[i]f these are indeed alkali wetlands they are not reproducible."

Mr. Sikes' lack of wetlands expertise also did not stop him from proceeding with such aggressive enforcement that it made open communication with the Kings impossible. The very next day after reviewing the email and single photograph from WDFW, Mr. Sikes was already reaching out to his colleague, Rick Mraz, to announce his "strong suspicion is that a prominent rancher leasing the DNR lands went on a bulldozing spree," which he believed was done "for apparent cattle water." Instead of asking Mr. Mraz whether they should consider the possibility that aggressive enforcement might cause the conversion of these agricultural lands to nonagricultural use (as Ecology is required to do by law, and as Mr. Mraz did in previous enforcement actions), Mr. Sikes asked, "Should this be referred to the AG criminal investigation folks?" Mr. Sikes' immediate interest in criminal enforcement confirms that he was never interested in offering any genuine help or "technical assistance" to the Kings, as he later claimed, but instead was only seeking to penalize

the Kings for what he clearly believed from the very beginning was a bad act done by bad people who he thought needed to be punished.

*Ecology staff pressured DNR to rush to judgment based on bad information.*

Within a week, by December 14, 2021, Mr. Sikes had already successfully pressured DNR to join Ecology in rushing to judgment. DNR's land manager Mark Bohnet told Mr. Sikes that he "could understand the reasoning for the excavation work" because "water availability was a limiting factor in that area" for a "cattle operation." Mr. Bohnet told Mr. Sikes there were "no specific conditions in the lease regarding this type of work." Instead of pursuing enforcement, he said he was inclined "to leave the wetlands alone to self-restore," and said DNR "may change lease terms upon renewal."

But in that same discussion, Mr. Sikes rebuffed Mr. Bohnet's reasonable instincts to seek cooperation and insisted on aggressive enforcement. Mr. Sikes emphasized to DNR staff what he said was "the relative value and sensitivity of these alkali wetlands" and "the degree of concern Ecology had," and said Ecology "would very likely pursue enforcement much more directly." Mr. Sikes told Mr. Bohnet that these areas were "very likely alkali wetlands, which are not replaceable." Because of Ecology's belief that they are irreplaceable, he claimed they are "*automatically characterized* as Category 1 wetland afforded the highest level of protection under state water quality law" (emphasis added). Mr. Sikes "also informed him that under 90.48, *DNR would actually be the responsible party*, at which point we both decided a management-level conversation would be best" (emphasis added).

Mr. Sikes' threats of potential enforcement against DNR, based on an "automatic" wetland characterization at the "highest" level, appear to have had the intended effect. Less than two weeks later, DNR sent its first notice to the Kings alleging a lease violation based on Ecology's position that "alkali wetlands" had been damaged. In the notice, DNR's Southeast Regional Manager, Todd Welker, claimed that the lease required "[p]rior written authorization" for any ground disturbing work, but DNR had never interpreted the Kings' lease that way in the past. DNR's notice ordered the Kings to sign an open-ended statement, with unknown requirements and unknown costs, admitting to Ecology's false allegations that "14 Alkali ponds" were damaged by "ground disturbing work on this lease." The statement included a blank-check commitment to "cooperate fully to restore all 14 Alkali ponds once DOE has determined a restoration plan." Since that time, we have learned that Ecology's own guidance documents (including the same guidance Ecology ordered the Kings to follow when restoring the alleged "alkali wetlands") state that the agency believes it is not even possible to restore "alkali wetlands." We hope you can understand why, in light of the history and context provided in this letter, the Kings would refuse to sign such a statement.

By January 25, 2022, less than two months after Mr. Sikes received the initial email from WDFW, Ecology was already firmly committed to its position that there had been "serious, unpermitted damage" to 17 different "rare, alkali wetlands." This information was communicated to Director Watson, as established fact, as part of an email titled "Request for information - Director Watson meeting with Commissioner Franz," a copy of which is attached to this letter. That email misled

Director Watson and Commissioner Franz into mistakenly believing that the regulated status of these areas, and the allegedly harmful nature of the alleged activities, had already been definitively established by credible data. In reality, Ecology's position at that time was based solely on "data provided by the reporting party, [Washington Department of Fish and Wildlife (WDFW)], and a review of July 2021 aerial imagery," but no site-specific data.

*Ecology and DNR unfairly interpreted a falsely accused party's healthy suspicion of the actions of government employees a lack of "cooperation."*

Initially, the Kings tried to communicate with Ecology and DNR about these issues, but by March of 2022, they had grown concerned that Ecology staff were not acting in a reasonable, good-faith basis to resolve this matter, and instead were scheming to gather evidence that could be misused against the Kings. And indeed, as noted above, Ecology staff members were in fact pursuing a criminal investigation from the very beginning, at the same time they were claiming to offer "technical assistance" to the Kings. Because of the threat of criminal prosecution, the Kings were forced to stop communicating openly with Ecology and DNR. Unfortunately, both agencies' staff misinterpreted the Kings' healthy suspicion (which turned out to be correct) as a lack of "cooperation," and then held that against them.

On January 31, 2023, DNR sent a letter to the Kings stating that DNR had terminated their lease based on Ecology's allegations of unauthorized excavations in alleged alkali wetlands. Three days later, on February 3, 2022, Ecology issued its enforcement orders, levied a penalty in the amount of $267,000, and indicated the Kings would be responsible for the costs to restore the alleged wetlands that were allegedly impacted (which, as noted above, Ecology guidance says cannot be done).

**Ecology failed to comply with RCW 90.48.450's requirements to consider and minimize the possibility of conversion of agricultural land.**

First, staff did not consider the agricultural nature of the property before deciding to proceed with enforcement. The alleged "alkali wetlands" are part of an existing agricultural area where stock watering operations have been conducted for decades. Staff knew this was an agricultural property and believed the alleged activities were done for stock watering purposes. But staff failed to make any effort to comply with RCW 90.48.450, which requires Ecology to enforce the Water Pollution Control Act in a way that "minimizes" the possibility that agricultural land will be converted to nonagricultural uses. So far, Ecology staff have done the opposite, *maximizing* the possibility of conversion by refusing to give any consideration to the agricultural nature of this property, or to consider any other option besides aggressive enforcement against an existing and ongoing agricultural operation.

In particular, the checklist on the form used by staff for the Recommendation for Enforcement Action (RFE) in this matter, did not address the RCW 90.48.450 conversion issue. The version of the RFE checklist used for other enforcement matters (including one that appears in the King Ranch file that was apparently used by Rick Mraz in 2017) specifically addresses agricultural conversion. That version of the RFE checklist asks, "*Has consideration been given to the effect*

*of the action on conversion of agricultural to nonagricultural uses?______. If yes, what attempts have been made to minimize the possibility of such conversion? (Water Quality Program Policy #1-05).*" But in this matter, in the same space where that question appears on the 2017 checklist and other checklists, the RFE checklist simply says "Other," with a note indicating "Specify violation."

But even without the prompt from the RFE checklist, Ecology staff knew enough to flag the agricultural conversion issue. The staff members who drafted the RFE were obviously aware that the property was used as a ranch. As noted above, as early as December 7, 2021, Jeremy Sikes was telling other staff the alleged excavation activities had been done "for apparent cattle water," but in the same email, he went on to ask about bringing a criminal enforcement action instead of protecting agriculture and stock watering. On that same date, Sara Hunt forwarded Sikes' email to Brook Beeler and Joenne McGerr with the comment, "making you aware of this investigation, esp. as it is *agriculture and water related* as well as wetlands" (emphasis added). And as early as December 28, 2021, Ms. Hunt had already drafted a "Communications Plan" confirming that Ecology staff had already jumped to the firm conclusion that the areas where these alleged activities occurred were definitely regulated wetlands, and definitely "rare, irreplaceable alkali wetlands." Staff's RFE described how, in previous lease discussions with DNR 10 to 15 years ago, the Kings "expressed desire to expand surface water availability" for stock watering. The RFE also interpreted the Kings' correspondence as asserting that the Kings "have worked the land in the same manner for the past 65 years."

Despite this awareness of the agricultural context, Ecology staff did not discuss or consider the possibility of conversion, and they made no efforts to "minimize" that possibility by attempting to use even one of the many other non-enforcement tools the legislature has given Ecology. Ecology's obligation to "minimize" the possibility of conversion is ongoing today, and we sincerely hope this letter will help start a productive discussion with Ecology about the best way to keep this land in ranching.

**Ecology staff failed to consider impairment of stock water rights and issued enforcement orders that violate RCW 90.48.422.**

Staff also failed to consider the logical outcome of its directive that areas of existing and ongoing stock watering activities are protected "alkali wetlands" that can never be touched again: the Kings' stock water rights are already being conditioned and impaired as a result of the enforcement action; and if staff's current interpretation were upheld, their water rights would be abrogated. This approach to the Kings' water rights violates RCW 90.48.422, which mandates that Ecology "may not abrogate, supersede, impair, or condition the ability of a water right holder to fully divert or withdraw water under a water right permit, certificate, statutory exemption, or claim granted or recognized under chapter 90.03, 90.14, or 90.44 RCW" through Ecology's authority under the Water Pollution Control Act.

Ecology staff knew about the agricultural context and believed the alleged activities were performed for stock watering purposes as early as December 2021. In February 2023, however, Ecology's spokesperson told the Spokesman-Review that "[w]e haven't been able to tell" the

purpose. Ecology's press release was also silent about the agricultural context for the alleged activities. Instead of recognizing the existing and ongoing stock watering activities on the King Ranch, the press release sidestepped the stock water issue and focused on denigrating, chastising, and defaming the Kings: indicating that the Kings were not practicing "[r]esponsible" ranching, and stating, "These actions are concerning because they don't match our understanding of the agriculture community's desire to care for the land." It is absurd to suggest that the Kings do not care for this land.

At each step in the enforcement process, Ecology staff continued to break or bend the rules. In the RFE, staff disregarded the legal and scientific criteria and indicators for determining whether an area is a regulated wetland: wetland hydrology, hydric soils, and hydrophytic vegetation. Instead, staff focused on indicators of alkalinity, such as what staff claimed were white salt encrustations viewed from aerial and satellite images. Staff claim they found some "wetland plant species" on some of the sites, but they made no attempt to determine whether any such species would have been present at the time of the alleged activities, when these areas were dry. According to Ecology guidance on "alkali wetlands," wetland plants and animals *are not present* during the dry months, which makes sense because the water is not there either. Staff also made no apparent effort to determine whether any such "wetland plant species" actually *dominated* a particular site, as required for a wetland determination.

**The alleged excavation activities did not cause any "pollution" or violate any Surface Water Standards.**

Ecology's press release accused the Kings of causing "pollution" and violating the Surface Water Standards through the alleged activities, but this is not a case of industry dumping chemicals into a river, or where a developer has drained, filled, converted, and paved a western Washington wetland for a development project that will cause pollution downstream. On the contrary, some of the scientific literature discusses potential water quality benefits from the kinds of dugout stock ponds used in the ranching industry.

The alleged "pollution" here is simply the same on-site soils that Ecology says were disturbed by the alleged activities. Excavation in western Washington-style wetlands can sometimes cause harmful downstream sedimentation, but Ecology had admitted that these alleged "alkali wetlands" "are isolated from other surface waters of the state," so there can be no downstream pollution from the alleged excavation activities. Ecology's guidance documents recognize that "alkali wetlands" do not perform important water quality functions. The agency's guidance also indicates that any pollutant trapping function performed by "alkali wetlands" is mostly a function of the volume of water stored in each "alkali wetland," which was *increased* by the alleged activities.

And as explained below, when the unique nature of the King Ranch is properly understood, and when the site-specific beneficial uses of these sites are correctly analyzed in the context of the overall needs of this landscape, it becomes clear that *Ecology staff had it exactly backwards*: far from impairing beneficial uses, these alleged excavation activities actually provided a net benefit to the beneficial uses that actually exist on the ground—not only by supporting stock watering, but also by providing water and habitat for birds and other animals and plants, providing more water

that can trap more pollutants, and preventing the eventual disappearance of *any* wet areas on the King Ranch, which scientific literature confirms is inevitable with sedimentation over time.

**Ecology staff misinterpreted the Surface Water Standards as prohibiting any activities in areas it considers "alkali wetlands," regardless of the actual beneficial uses of a site.**

Ecology staff's analysis of the Surface Water Standards (WAC 173-201A) was built around staff's rushed decision that these areas meet the regulatory definition for "wetlands" and the criteria in Ecology guidance for "alkali wetlands." The analysis was also based on staff's rushed decision that *the only possible beneficial uses* of these areas are the values the agency claims are associated with alkali wetlands, even though staff knew these areas were historically used for stock watering.

Staff reasoned that, because they believed these areas to be "alkali wetlands," which staff said were part of ecological systems listed in the Washington Natural Heritage Program as "Imperiled" and "Critically Imperiled," *all agricultural and other activities in or around these areas are automatically and absolutely prohibited*. This approach wrongly treats DNR's non-regulatory Natural Heritage Program as dictating a "no touch" approach to "alkali wetlands" under the Water Pollution Control Act, and it wrongly elevates Ecology staff's desire to protect what it sees as the "beneficial uses" of "alkali wetlands" over all other existing, designated, and beneficial uses.

*Ecology failed to follow its own water quality regulations and guidance.*

Ecology staff failed to follow the "Procedures for applying water quality criteria" in WAC 173-201A-260(3), which requires Ecology to evaluate water quality in wetlands by applying specific criteria. The water quality criteria for wetlands state that "[w]ater quality in wetlands is maintained and protected by maintaining the hydrologic conditions, hydrophytic vegetation, and substrate characteristics necessary to support existing and designated uses." On the King Ranch, *stock watering* is the only existing and designated use of waters, and it is the only use the state legislature has declared to be legally "beneficial." Again, our consultants' opinion is that these "alkali" areas are not regulated wetlands; but even if that were not the case, Ecology's own standards say water quality in these alleged wetlands was protected by maintaining the hydrologic conditions, hydrophytic vegetation, and substrate characteristics necessary to support *stock watering*.

Ecology's own wetland guidance recognizes that "Wetlands are often located in the transition zone from deep water habitat (e.g., river, stream or lake) to upland, where the deep waterbody is actually being used for stock watering." The guidance is not specific to dugout stock ponds, but it recognizes "considerable debate concerning the use of wetlands for stock watering" and states that stock watering "must" be "protected." The guidance recommends that Ecology find a balance between protecting stock watering and preventing the activity from "significantly degrad[ing] a waterbody's ability to perform other beneficial uses (e.g., fish and wildlife habitat)," and that Ecology do so "through BMPs and other regulatory and nonregulatory efforts is essential to ensuring wetlands and other waterbodies can support all legitimate beneficial uses possible."

Ignoring the status of stock watering as a beneficial use, Ecology's enforcement order says the alleged excavation activities impaired "the beneficial uses that these wetlands provide to *wildlife*

*and other aquatic life*." But as explained below, the opposite is true: dugout stock ponds create and enhance habitat for birds and other wildlife, for the simple reason that they provide life-sustaining water in this arid region, where there are no streams or creeks and few seeps to drink from. As for "aquatic life," that is Ecology's reference to certain unspecified "nonfish" aquatic species that Ecology suggests may be present in the alleged "alkali wetland" areas. Ecology has not told us which "nonfish" aquatic species it believes were impacted by the alleged activities, but Ecology guidance suggests any life in these areas would have been limited to aquatic invertebrates (water bugs). In any case, because these areas were dry at the time of the alleged activities, there is no possibility of any impact to any water bugs or any other aquatic species.

In short, there was no "pollution," and this is not about water quality or flow control. Ecology's guidance documents show that the agency values "alkali wetlands" not because they provide important water quality or flow control functions, but because Ecology prefers certain "alkali"-loving plants and invertebrate species over other species, and over other beneficial uses like stock watering.

Ecology's enforcement against the King Ranch turns the state's beneficial use framework on its head, by elevating water bugs over benefits to other species, and over legislatively-declared beneficial uses like stock watering. Ecology's surface water standards require Ecology to first "protect" existing and beneficial uses, such as stock watering; and then, when there are multiple designated uses, to *balance* the uses rather than picking one designated or beneficial use over the other. After giving appropriate weight to the stock watering benefits, habitat benefits, and other potential benefits of dugout stock ponds, it would be unreasonable for Ecology to pick the alleged benefits of "nonfish aquatic species," or particular plant species, over stock watering, bird habitat, and other benefits resulting from the alleged activities.

**Benefits from dugout stock ponds to wildlife habitat.**

Ecology's press release also suggests that the alleged activities damaged habitat for migratory birds, but the opposite is true. There is broad consensus across the scientific community, and among bird advocacy nonprofits like Ducks Unlimited, that these kinds of dugout stock ponds provide significant benefits to migratory and other birds. Ecology's own guidance documents discuss the benefits that can result "when shallow ephemeral ponds are dredged to make areas with longer periods of standing water (such as stock ponds)," thereby "[i]ncreasing the duration of saturation or inundation [which] can change the use of wetlands by a variety of birds," including increased short-term use of unvegetated spoils of newly excavated basins by shorebirds, and increased long-term use by several species of diving and dabbling ducks, coots, and terns after revegetation.

Another benefit of dugout stock ponds is the preservation of wet areas on the arid Columbia Basin that would otherwise naturally disappear over time. Ecology's own guidance recognizes that, over the decades and centuries, any wet areas on the King Ranch will inevitably fill in with sediment. This is one reason why agencies like Ecology and DNR have embraced the benefits of wetland excavation in certain contexts: it removes built-up sediment, restoring the wetland hydrology that would not be present without excavation.

If Ecology were successful in stopping ranchers from digging historically exempt stock ponds on the Columbia Plateau, many of the areas Ecology considers to be "alkali wetlands" would fill in and dry up. That would eliminate important habitat for migratory birds and other species, in addition to shutting down ranching businesses and likely causing the conversion of agricultural land. It would also increase wildfire risk on grazing lands and abutting lands and hazards to ranchers, and their cattle and wildlife. Thus, a final benefit of the alleged activities is preventing the inevitable disappearance of all wet areas from the King Ranch.

*The State has engaged in the same type of excavation that is alleged to be illegal.*

WDFW has also embraced beneficial wetland excavation practices. For example, WDFW has engaged in beneficial excavation of "wetland cells" on state-owned land near the King Ranch, such as Desert Lake Ponds. According to WDFW, "[e]nhanced wetlands within the project waters will provide nesting and feeding habitat for a multitude of species," including ducks that provide waterfowl hunting opportunities at Desert Lakes and "other species that require early succession vegetation." Over the years, the Kings have seen a wide variety of birds and other wildlife come to drink water and live near dugout stock ponds on the ranch.

**Request for meeting.**

The legislature has given Ecology many other tools besides enforcement, especially in the agricultural context. In cases like the King Ranch, to recognize vested exempt stock water rights, and to meet Ecology's statutory obligations to minimize conversion and avoid interfering with water rights, the agency must at least *attempt* to use such voluntary, incentive-based methods, along with all other available non-enforcement tools. Ecology cannot meet its statutory obligations to protect agriculture and water rights if it does not even attempt to use those tools.

For example, "[w]hen a water quality standard cannot be reasonably met through the issuance of permits or regulatory orders issued under the authority of this chapter," Ecology can use "voluntary, incentive-based methods including funding of water conservation projects, lease and purchase of water rights, development of new storage projects, or habitat restoration projects in an attempt to meet water quality standards" under RCW 90.48.422(2). We believe a comprehensive analysis will show that the water quality standards are already met because dugout stock ponds provide a net environmental benefit, in addition to being part of an existing use that is the only specifically designated use on the King Ranch that is also legislatively declared to be "beneficial." But even if that were not the case, and even if Ecology had jurisdiction over these areas and activities (again, we believe it does not), Ecology would still be obligated to attempt a voluntary, incentive-based method or some other non-enforcement approach.

That is the discussion Jeremy Sikes should have started in 2021, instead of rushing to premature judgment and leveling the frivolous and false accusation that the Kings allegedly committed a crime by ranching. And if Mr. Sikes had simply followed Ecology's own regulations and guidance, all of this could have been avoided and, by now, we are confident that we would already have finished a productive discussion about how to lawfully harmonize stock watering with

SUBJECT TO EVIDENCE RULE 408
NOT ADMISSIBLE TO PROVE LIABILITY IN CIVIL PROCEEDINGS
OR TO PROVE GUILT IN CRIMINAL PROCEEDINGS

Ecology's desire to regulate areas of historic, existing, and ongoing stock watering activities as "alkali wetlands." Despite all that has happened, we still look forward to having that discussion.

The Kings are not litigious people. They would very much prefer to focus their time and efforts on their family, raising the highest quality cattle they can, feeding people, and stewarding the land they have loved and managed for decades. Unfortunately, with the entire State of Washington now coming after them, the Kings have been villainized, defamed, and forced to defend themselves. We do not know everything the Director has heard about the Kings, but we are concerned that much of it is based on misinformation and unsupported assumptions. As a result of the many flaws in the State's process, the State's actions now threaten to destroy the Kings, their family business, and their industry. With the information in this letter, we hope the Director will start to understand the problems with Ecology's position and take this opportunity to meet with us to discuss a more productive path forward.

We appreciate Director Watson's time and consideration of this request. We look forward to receiving written confirmation from you, *within ten days from the date of this letter*, that Director Watson would like to schedule a meeting to discuss these issues, and the King Ranch matter, in the immediate future. If we do not hear from you within ten days from the date of this letter, then our clients will interpret that lack of response to mean Ecology has no interest in trying to find a way to work together to informally resolve these issues, and they will proceed accordingly. We look forward to hearing from you soon.

Kind regards,

VAN NESS FELDMAN LLP

Duncan M. Greene
Partner

James P. Grifo
Counsel

Enclosure
cc: Neil Caulkins, AAG, via email (w/encl.)

# Enclosure

# Email to Director Watson (January 25, 2022)

**From:** North, Teri (ECY)
**Sent:** Tuesday, January 25, 2022 1:09 PM PST
**To:** Watson, Laura (ECY)
**Subject:** DNR Updates - for your call with Hilary
**Attachments:** Request for information - Director Watson meeting with Commissioner Franz_01252022 (DNR).docx

**From Stu:**
Laura may want to touch base with the Commissioner on how the small forest landowner work group and funding for it is progressing. Part of the DNR assignment is to coordinate with Ecology on offsets.

As I recall this was not funded as the section was added at last minute and not covered by the existing FN at time of passage.

See overview below.

Small Forestland Owner Work Group. The Department of Natural Resources must contract with a Washington nonprofit that can demonstrate a membership of at least 1000 small forestland owners and promotes the sustainable stewardship of family forestland to establish and implement a small forestland owner work group. The purpose of the work group is to identify possible carbon market opportunities, including the provision of qualifiable offset credits, and other incentive-based GHG reduction programs that Washington landowners may be able to access, including compliance markets in other jurisdictions, voluntary markets, and federal, state, and private programs for forestlands. The work group must:

- provide recommendations for implementation and funding a pilot program to develop an aggregator account that will pursue carbon offset projects for small forestland owners in Washington;
- coordinate with Ecology on the development of offset protocols; develop a framework and funding proposal for establishing a program to link interested small forestland owners with incentive-based carbon reducing programs that facilitate adoption of forest practices and increase carbon storage and sequestration in forests and wood products; and
- recommend policies to support the implementation of incentives for participation in carbon markets.

By December 1, 2022, the work group must transmit a final report to Ecology that provides recommendations for incentives, the implementation of incentives, payment structures Senate Bill Report - 14 - E2SSB 5126 necessary to support small forest landowners, and whether the work group should be extended or made permanent.

**From Joenne & Brook:**

Park Lake Wetlands Violation in Grant County

- The Shorelands and Environmental Assistance Program (SEA), ERO sent a letter of inquiry to the Department of Natural Resources (DNR), the U.S. Department of Fish and Wildlife (USFWS), and Wade and Teresa King (King Ranch) regarding serious, unpermitted damage to, what we believe are, rare, alkalai wetlands. These alkali wetlands are located on a channeled scabland plateau east of Park and Blues Lakes in Grant County, about 14 miles northeast of Soap Lake.
- Based upon data provided by the reporting party, Washington Department of Fish and Wildlife (WDFW), and a review of July 2021 aerial imagery, we estimate that 17 wetlands were damaged

sometime in the spring of 2021. Deep pools had been excavated within the shallow wetlands, and the spoils were placed in and adjacent to the wetlands. Alkali wetlands take centuries to form through groundwater percolation and evaporation, are home to unique plant and animal species including the Alkali bee, which is vital to crop fertilization, such as alfalfa.

- The Confederated Tribes of the Colville Reservation are concerned cultural resource sites were damaged.
- Two of the wetlands are located on lands owned by the USFWS (managed by WDFW), 14 are located on Department of Natural Resources land leased by King Ranch, and one more is located on King Ranch property. DNR is the landowner for the majority of the sites, and has a lease agreement with King Ranch to allow cattle grazing. DNR states they did not undertake the work, and assume that the lease-holder King Ranch undertook the project to enhance stock water on their leased ground.
- DNR sent a *Notice of Default* to lease-holder King Ranch inquiring about the unpermitted work on the state-owned land. The King Ranch response disputed any illegal activities have occurred. The response copied Senator Warnick and Representative Dent and we expect the legislators will invite Ecology to a meeting to discuss the issue in the near future.
- We continue to coordinate with an interagency team that includes DNR, WDFW and Grant County on next steps, including a site visit in the spring.
- A response to our inquiry is due Feb. 3.

**Also from Joenne – see attached**

**From Mary:**

**Regarding DNR's appeal of WRP's denial of seasonal water rights changes**

**Current status**
As of mid-January 2022, WRP is engaged in settlement negotiations with DNR. We are very far apart.

**Background**
Tiegs LLC's was discovered illegally irrigating in 2021 on land leased from DNR. DNR submitted seasonal water right change applications to cover a portion of this usage, but ERO denied the largest of the applications because the water right would have been transferred out of the WRIA of the current purpose of use, contrary to the Family Farm Water Act. DNR appealed the denial and argued Ecology should not have denied its seasonal transfers because DNR is not constrained by 90.66.065's limitation on out-of-WRIA transfers.

The crux of our disagreement is interpretation of RCW 90.66.065.

- RCW 90.66.040 defines: (1) "Family farm" means a geographic area including not more than 6,000 acres of irrigated agricultural lands.
- RCW 90.66.050 provides: (1) "Family farm permits". Such permits shall limit the use of water withdrawn for irrigation of agricultural land to land qualifying as family farm. … (3) "Publically owned land permits". Such permits shall be issued only to governmental entities permitting the irrigation of publically owned lands. RCW 90.66.050: Classes of permits for withdrawal of public waters for irrigation purposes—Conditions—Requirements.
- RCW 90.66.065 Transfers or change in purpose of family farm permits: (5) Place of use shall remain within the WRIA containing the place of use before the transfer. RCW 90.66.065: Transfers or change in purpose of family farm permits. (wa.gov).

DNR is taking the position that its water rights, including those on the land leased to Tiegs, are considered "Publically owned land permits" and are thus not "Family farm permits" and are not limited by 90.66.065's constraint on out-of-WRIA transfers. DNR asserts that .065 does not apply to publicly owned land permits, thus there would be no limits on DNR's transfer of its water rights out of the WRIA of the place of use.

**Settlement discussions to-date**

AAG Matt Janz invited DNR to consider a settlement in which DNR accepted a penalty if the case was settled in DNR's favor and we could agree on an interpretation of RCW 90.66.065. DNR countered with an offer to accept a penalty for illegal irrigation in 2021 and pay a penalty of $21,400 for 214 days of irrigation at a proposed penalty of $100 a day. Then they added additional conditions:

- Ecology agrees across the board that .065 does not apply to publicly owned land permits.
- Ecology agrees that the regular change application statutes would apply to DNR's applications for transfer of publicly owned land permits.
- Ecology allows the water service contract to go forward.
- Ecology allows DNR to administratively change family farm permit water rights that DNR has acquired to publicly owned land permits.

Working bottom to top through this counteroffer:

- There is no basis in law in the FFWA for Ecology to administratively change the classification under RCW 90.66.050 from one type to another, from family farm to publicly owned land permits.
- Regarding the water service contract going forward, the offer was to have a penalty in lieu of the water service contract covering 2021. Given the legal risk of the water service contract covering 2021, it would only cover 2022.
- As to the first two counteroffer points about agreeing .065 does not apply, and that DNR can transfer its waters right through the regular change application process, WRP's ERO and CRO Region Managers are concerned, and the AGO has described there are legal risks.

**Why we think it's important to avoid DNR's interpretation of FFWA:**

"Publically owned land permits" shall be issued only to governmental entities permitting the *irrigation* of publically owned lands. While the majority of Publically Owned land Permits *are* for irrigation, there are a outliers across the state that provide for stock watering, domestic supply, commercial/industrial, wildlife use, and instream flow. The history of those rights is a bit vague and will require more research to gather details.

The WRP's specific concerns are:

- If RCW 90.66.065 applies only to Family Farm Permits - and not also Publically Owned Land Permits, Family Farm Development Permits, and Publically Water Entity Permits - then the constraints captured in 90.66.060 and .065 do not apply to those other categories of permits. They would not have to meet the definition of family farm (< 6k acres), and their changes in purpose of use would not be constrained to transfers within WRIA of existing use.
- If we ignore liberal construction as directed in 90.66.900 and go with a narrow reading of the applicability language as it pertains to the other three categories of permits, the implications are wide-ranging and do not protect irrigated agriculture in the way the statute originally intended.

- The statute is silent on future disposition of those water rights or limits on how they can be changed.
- If .065 doesn't apply, none of the constraints apply… WRIA boundary, purpose of use outside of a UGA, water system conservation requirements, etc.

**Legal assessment**
Matt Janz's legal assessment is that we risk losing if this matter proceeds to litigation. If we do not settle and DNR wants to push the point of its interpretation of "public lands" carve-outs in the statute, DNR will present legislative history indicating that the lawmakers were in line with DNR's position when they passed the .065 amendment and the FFWA. He and Steve North are satisfied the litigation risk has been communicated should Ecology decide to not settle the matter. We have an argument that when legislators wrote "family farm permit" they meant "family farm water act permit" meaning all subtypes of FFWA permits in RCW 90.66.050. While this isn't the best argument, it is an argument we can make. If our interpretation of the FFWA is broken, and we go ahead with litigation, a decision from the PCHB will guide us on how to fix it.

When Ecology was first provided advice on whether to deny the DNR's application, their initial advice was that an argument could be made that .065 was the only method to transfer a FFWA water right, therefore, to remove .065 from applying to Publicly Available Land Permits would mean that the right was not available for transfer and the application was still correctly denied. This argument is predicated upon a showing that prior to the enactment of .065 FFWA permits were not transferred. But the historical basis is not there. In our records for the past two decades, there are no records of any transfer of a publicly owned land permit in any form nor can Ecology staff at ERO recall of one. There is no record of previous publicly owned land permits being denied on the basis of Family Farm Water Act restrictions on out-of-WRIA transfers. Our information is that prior to the passage of .065 by amendment, family farm permits were allowed to be changed so long as they were for irrigation purposes, which defeats our argument. The only changes we are aware of approving a different purpose of use are listed as "temp instream flow donations" approved by OCR. We will still make the argument if we proceed to litigation, but it doesn't seem likely to succeed.

Another question is whether the FFWA rights must still be for irrigation purposes even without the applicability of.065. This may or may not be addressed in this litigation depending on how the PCHB interprets the FFWA, but could be made a condition of a settlement.

**Next steps in settlement**
At this point, Matt is preparing to reject the DNR offer and respond with a settlement offer that would address the land in question in this litigation and not DNR's interpretation of RCW 90.66.065. If we can go forward without accepting a blanket carve-out for DNR or all publicly-owned lands, we could settle this case favorably in a way that doesn't affect future cases. This is something DNR has previously said they weren't interested in as they have more of these situations in the pipeline, but we will try.

If settlement talks go nowhere, we will need an external communication plan to explain our position in response to questions. We have not yet drafted a comms plan pending signals whether the settlement talks look promising.

**From Rich:**

Perhaps a minor point but sharing support for HB1895, Forest Conservation. Bill support water quality improvements by expanding incentives for riparian buffers, reforestation and a focus on highly impacted/overburdened communities. More trees in the latter, typically in more urbanized areas, also reduce stormwater impacts.

We are meeting with DNR and the federal services separately so I don't have more to add except Laura might want to consider mentioning the link between the maintaining clean water act assurances and the HCPs, if she hasn't already done so.

We are meeting with DNR staff and Clark County officials on a proviso for funding lake management planning for Vancouver Lake. We would value engagement from DNR's Aquatic lands staff.

# APPENDIX 3

For Official Use Only

# STANDARD TORT CLAIM FORM

General Liability Claim Form #SF 210

Pursuant to Chapter 4.92 RCW, this form is for filing a tort claim against the state of Washington. Some of the information requested on this form is required by RCW 4.92.100 and may be subject to public disclosure.

**PLEASE TYPE OR PRINT CLEARLY IN INK**

**Mail or deliver original claim to** Department of Enterprise Services
Office of Risk Management
1500 Jefferson Street SE
MS 41466
Olympia, Washington 98504-1466
Fax: 360-507-9251

Business Hours: Monday – Friday 8:00 a.m. – 5:00 p.m.
Closed on weekends and official state holidays.

1. Claimant's name: King (Last name) Wade & Teresa (First) ____ (Date of birth (mm/dd/yyyy))
2. Inmate DOC number (if applicable): N/A
3. Current residential address: 31215 Moore Road NE, Coulee City, WA 99115
4. Mailing address (if different): Same (phone & email below c/o Kings' attorneys)
5. Residential address at the time of the incident: (if different from current address) Same (phone & emails below c/o Kings' attorneys)
6. Claimant's daytime telephone number: (360) 298-4782 (Home) (360) 298-4782 (Business or Cell)
7. Claimant's e-mail address: jgrifo@vnf.com
8. Date of the incident: ____ (mm/dd/yyyy) Time: ____ ☐ a.m. ☐ p.m. (check one)
9. If the incident occurred over a period of time, date of first and last occurrences:

   from 01/01/2021 (mm/dd/yyyy) Time: 09:00 (mm/dd/yyyy) ☑ a.m. ☐ p.m.

   to 12/20/2024 (mm/dd/yyyy) Time: 05:00 (mm/dd/yyyy) ☐ a.m. ☑ p.m.

10. Location of incident: Grant County and Douglas County, Washington, and other locations (See Exhibit A)
    State and county — City, if applicable — Place where occurred

11. If the incident occurred on a street or highway:

N/A

| Name of street or highway | Milepost number | At the intersection with or nearest intersecting street |
|---|---|---|

12. State agency or department alleged responsible for damage/injury:

Washington State Department of Ecology, Washington State Department of Natural Resources, Washington State Attorney General's Office, potentially other agencies/departments

13. Names, addresses and telephone numbers of all persons involved in or witness to this incident:

See Exhibit A for Claimants' preliminary list. Claimants reserve the right to identify additional persons involved in or witness to the incidents and conduct in question.

14. Names, addresses and telephone numbers of all state employees having knowledge about this incident:

See Exhibit A

15. Names, addresses and telephone numbers of all individuals not already identified in #13 and #14 above that have knowledge regarding the liability issues involved in this incident, or knowledge of the Claimant's resulting damages. Please include a brief description as to the nature and extent of each person's knowledge. Attach additional sheets if necessary.

Known individuals have been identified in Exhibit A. Claimants reserve the right to identify additional individuals with knowledge regarding this matter.

16. Describe the cause of the injury or damages. Explain the extent of property loss or medical, physical or mental injuries. Attach additional sheets if necessary.

See attached Exhibit A. Claimants reserve the right to amend this description to provide additional information, including information about damages and injury that are continuous and ongoing.

17. Has this incident been reported to law enforcement, safety or security personnel? If so, when and to whom? Please attach a copy of the report or contact information.

N/A

18. Names, addresses and telephone numbers of treating medical providers. Attach copies of all medical reports and billings.

N/A

19. Please attach documents which support the allegations of the claim.

20. I claim damages from the state of Washington in the sum of $ $ 30,000,000.00.

This Claim form must be signed by the Claimant, a person holding a written power of attorney from the Claimant, by the attorney in fact for the Claimant, by an attorney admitted to practice in Washington State on the Claimant's behalf, or by a court-approved guardian or guardian ad litem on behalf of the Claimant.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

***Signature of Claimant Or***

***Date and place (residential address, city and county)***

[signature]

***Signature of Representative***

164 Dougherty Lane, Friday Harbor, WA 98250

***Date and place (residential address, city and county)***

James P. Grifo, Attorney

***Print Name of Representative***

WSBA No. 45192

***Bar Number (if applicable)***

**EXHIBIT A**

**Standard Tort Claim Form**

**Wade and Teresa King**

**Responses to Item Numbers 10, 13, 16, and 20**

**Item No. 10:**

Certain conduct by government officials alleged in this form occurred on the subject King Ranch properties, which are located in Grant County and Douglas County, Washington.

Other conduct by government officials alleged in this form occurred in other locations, including but not limited to Lacey, Richland, Spokane, Union Gap, Ellensburg, Olympia, Burlington, and Walla Walla, Washington.

**Item No. 13:**

Ecology

- Laura Watson, laura.watson@ecy.wa.gov, 300 Desmond Dr. SE, Lacey, WA 98503
- Jeremy Sikes, Jeremy.sikes@ecy.wa.gov, 4601 N. Monroe St., Spokane, WA 99205
- Richard Mraz, rmra461@ecy.wa.gov, 300 Desmond Dr. SE, Lacey, WA 98503
- Brook Beeler, bbee461@ecy.wa.gov, 300 Desmond Dr. SE, Lacey, WA 98503
- Joanne McGerr, jomc461@ecy.wa.gov, 300 Desmond Dr. SE, Lacey, WA 98503
- Kerry Carroll, kerry.carroll@ecy.wa.gov, 300 Desmond Dr. SE, Lacey, WA 98503
- Matt Fisher, matt.fisher@ecy.wa.gov, 4601 N. Monroe St., Spokane, WA 99205
- Amy Yahnke, amy.yahnke@ecy.wa.gov, 300 Desmond Dr. SE, Lacey, WA 98503
- Sara Hunt, sara.hunt@pnnl.gov, Pacific Northwest National Laboratory, P.O. Box 999, Richland, WA 99352
- Hallie Ladd, hallie.ladd@ecy.wa.gov, 4601 N. Monroe St., Spokane, WA 99205
- Lori White, lori.white@ecy.wa.gov, 1250 Alder St, Union Gap, WA 98903
- Stephanie May, stephanie.may@ecy.wa.gov, 500 Tausick Way, Walla Walla, WA, 99362 Office # 2018, 2018A, 2018B

DNR

- Hilary Franz, cpl@dnr.wa.gov, Office of the Commissioner of Public Lands, MS 47001, Olympia, WA 98504-7001
- Rhetta Cypert, Rhetta Cypert, rhetta.cypert@dnr.wa.gov, 713 Bowers Road, Ellensburg, WA 98926
- Todd Welker, todd.welker@dnr.wa.gov, 713 Bowers Road, Ellensburg, WA 98926
- Larry Leach, Larry.Leach@dnr.wa.gov, 713 Bowers Road, Ellensburg, WA 98926

- Michael Kearney, Michael.kearney@dnr.wa.gov, 1111 Washington St. SE, PO Box 47014, Olympia, WA 98504-7016
- David Welz, David.welz@dnr.wa.gov, 713 Bowers Road, Ellensburg, WA 98926
- Wyatt Leighton, Wyatt.leighton@dnr.wa.gov, 713 Bowers Road, Ellensburg, WA 98926
- Kaerlek Janislampi, Kaerlek.janislampi@dnr.wa.gov, 713 Bowers Road, Ellensburg, WA 98926
- Nate Morse, Nate.Morse@dnr.wa.gov, 713 Bowers Road, Ellensburg, WA 98926
- Laura Syvertson, Laura.syvertson@parks.wa.gov, Northwest Region Office, 220 N. Walnut St., Burlington, WA 98233

AG's Office

- Robert Ferguson,
- Courtney Blackburn,
- Robert Grant
- Thomas Young
- Neil Caulkins
- Sonya Wolfman

WDFW

- Richard Finger
- Carmen Andonaegui
- Chad Eidson
- Kat Kelly

**Item No. 16:**

The State of Washington, through its employees and elected officials at the Department of Ecology, the Department of Natural Resources, the Environmental Protection Division, and other divisions of the Attorney General's Office, have engaged in a pattern of tortious actions, failures to act, and other tortious conduct that individually and collectively constitutes an illegal attack on the Claimants, their rights, their livelihood, and their way of life.

One or more of the individuals and/or agencies have engaged in other tortious conduct, including without limitation conduct breaching common law, statutory, and other duties owed to Claimants; conduct in excess of statutory authority; arbitrary and capricious conduct; and conduct violating the Claimants' constitutional rights (including without limitation procedural and substantive due process rights), statutory rights, vested stock water rights, lease rights, fee simple rights, and other rights involving their personal rights and ongoing agricultural business concerns.

Such conduct gives rise to tort claims against the State of Washington, including without limitation: outrageous government misconduct; government misconduct; malicious prosecution, abuse of process, unlawful retaliation / retaliatory lease termination and non-renewal, intentional infliction of emotional distress, negligent infliction of emotional distress, tortious interference with contracts and

business expectancies, defamation (including slander and libel), false light, outrage, recklessness, negligence, negligence per se, and trespass.

The Claimants have suffered and continue to suffer damages, including but not limited to lost business, reputational harm, emotional distress from false accusations and violations of property rights and other rights, attorneys' fees, costs, expert witness fees, and other damages.

**Item No. 20:**

The Claimants claim damages from the State of Washington in an amount to be proven at trial but currently estimated to be no less than $30,000,000, including no less than $20,000,000 in economic damages and $10,000,000 in non-economic damages.